SUN COMPANY INC. AND SUBSIDI-
ARIES (CONSOLIDATED), Appellee,

v.

COMMISSIONER OF INTERNAL
REVENUE, Appellant.

No. 81-1997.

United States Court of Appeals,
Third Circuit.

Argued Feb. 1, 1982.

Decided April 16, 1982.

John F. Murray, Acting Asst. Atty. Gen., Michael L. Paup, Gary R. Allen (argued), George L. Hastings, Jr., Attys., Tax Div., Dept. of Justice, Washington, D. C., for appellant.

J. W. Bullion (argued), Buford P. Berry, Emily A. Parker, Thompson & Knight, Dallas, Tex., for appellee.

Before GIBBONS, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

In this appeal we are asked to decide whether the costs of drilling offshore exploratory oil and gas wells from mobile rigs are deductible in the year in which they are incurred as "intangible drilling and development costs" under 26 U.S.C. § 263(c) and Treas.Reg. § 1.612–4(a) ("the IDC option"). The Tax Court ruled in favor of the taxpayer, Sun Co., and against the Commissioner, in holding that such drilling costs are immediately deductible under § 1.612–4(a). We agree with the Tax Court's holding and affirm its decision.

I.

Taxpayers in this case are an affiliated group of corporations of which Sun Company, Inc. is the common parent, (hereinafter "Sun" will be used when referring to the group of corporations). As part of its business, taxpayers, during the period in question, participated in the exploration, leasing, and development of numerous offshore oil and gas properties. The dispute before this court involves the taxpayers' participation in two separate joint ventures: one engaged in developing certain offshore Louisiana oil and gas properties; and another engaged in developing North Sea oil and gas properties.

The Tax Court's findings and opinion contain a detailed factual statement involving offshore oil and gas operations in general and the seventeen specific wells at issue. The factual statement is derived largely from the parties' stipulations. See A.160 n.1, 168–191. We see no need to repeat that statement here, and instead briefly summarize the portions that are relevant to this appeal.

The process of exploring for and producing oil and gas in offshore areas can generally be divided into three stages. The first step in any oil and gas operation, both offshore and onshore, is to collect and interpret geological and geophysical information to determine if the area in question contains subterranean structures which constitute potential traps for accumulations of oil and gas. The only way to determine whether such potential traps actually contain hydrocarbons is to drill into the structures.

Thus, the second stage in offshore operations involves drilling exploratory wells or "wildcat wells" to determine if particular structures contain oil or gas in commercial quantities. Such exploratory offshore wells are drilled from mobile rigs which are floated to the location and either anchored or set on the ocean floor for drilling. If oil or gas is discovered in commercial quantities, however, the well is not completed from the mobile rig. Instead, during the third stage of offshore operations, involving production of the hydrocarbons, it is necessary to install a permanent production facility to complete an offshore well.[1] The operator often permanently plugs and abandons the wells drilled from mobile rigs and then produces the hydrocarbons through another well drilled from a fixed production platform. Less frequently, the operator will temporarily abandon the well and preserve it for possible future production after reentry from a fixed production platform.[2] (App. 172).

By far the most common permanent offshore production facility is a fixed multiwell drilling and production platform which enables the operator to tap several sources of hydrocarbons. A fixed production platform located in 100 feet or more of water can cost millions, if not tens of millions, of dollars. Thus, exploratory wells are always drilled from mobile rigs to determine if sufficient quantities of oil and gas exist to justify the installation of such a platform. (A. 170–71).

The primary factors in determining whether to use an exploratory well drilled from a mobile rig for production are the amount of hydrocarbons in the particular well and the location of the well in relation to the optimum site for the fixed production platform. (App. 173). The optimal site enables the exploitation of several separate hydrocarbon reservoirs from the same platform. Such a site is not normally determinable until a number of exploratory wells have been drilled. Thereafter, reservoirs located by successful exploratory wells can be exploited by the installation over the optimal site of a fixed platform, from which several separate producing wells may be drilled. Often, those producing wells, because of the relation between the location of the fixed platform and the hydrocarbons, must be drilled at an angle from the platform, rather than through the vertical exploratory wells drilled initially from mobile rigs. Thus, the majority of the exploratory wells, even those which locate substantial quantities of hydrocarbons, will never be used as producing wells.

With respect to the particular offshore, exploration and production activities involved in this case, these operations followed the general pattern of offshore development as has already been outlined. Of the fifteen Gulf of Mexico wells at issue in this case, seven encountered hydrocarbons, but these exploratory wells were perma-

---

1. In contrast, onshore wildcat wells generally use the same drilling rig for production since once commercial quantities of hydrocarbons are discovered, the cost of completing the well is minimal when compared to the cost already incurred.

2. An alternative method of using an exploratory well drilled from a mobile rig as a producing well is through the use of a subsea completion. In a subsea completion, the well is actually completed by a mobile rig and the oil or gas produced from the subsea completion is then piped to a nearby fixed production facility through pipes laid on the ocean floor. (App. 171).

No subsea completions had been made by Sun in any of its operations as of the time of trial, although 252 subsea completion systems had been installed or were planned for installation by the industry as of July 1975. *Standard Oil Co. (Indiana)*, 68 T.C. 325 at 331.

nently plugged and abandoned. The eight other wells were either dry or experienced mechanical difficulty before reaching their intended depth. Following the drilling of the fifteen exploratory wells at issue and others, the combine in which Sun participated installed three fixed production platforms from which a total of forty-four producing wells were drilled.

In the North Sea, of the two wells here at issue, one was permanently plugged and abandoned, and the other temporarily plugged and abandoned. No production facility was ever ordered or built in this area.

Sun filed a consolidated corporate federal income tax return for 1971, in which it deducted from its gross income its allocable share of the costs incurred in that year in drilling the seventeen exploratory wells at issue, on the theory that such costs qualified as intangible drilling and development costs (IDC) deductible Treas.Reg. § 1.612–4(a). On audit, the Commissioner determined a deficiency in taxpayers' taxes based on the conclusion that the costs of the exploratory drilling here in question did not qualify for the IDC operation. The Commissioner asserted that no deduction was available since the drilling took place at an exploratory stage in the operations at a time when no decision had been made to develop the properties in question through the installment of production facilities. Taxpayers petitioned the Tax Court for redetermination. Rejecting the Commissioner's distinction between merely exploratory and developmental drilling, the Tax Court ruled that all of the drilling costs qualified for the IDC option.

## II.

Section 263(a) of the Internal Revenue Code states the general rule that taxpayers cannot deduct amounts paid "for permanent improvements or betterments made to increase the value of any property or estate." I.R.C. § 263(a)(1) Such expenses are capital in nature and are subject to eventual recovery by way of deductions for depreciation. See I.R.C. § 167. In this case, the parties do not dispute that under

Section 263(a)(1), absent any other code provision, the costs of drilling exploratory wells from mobile rigs in offshore oil fields would be regarded as capital in nature and thus, not deductible other than through depreciation. However, Section 263(a)(1) is not the only Code provision bearing on this subject.

Section 263(c) exempts "intangible drilling and development costs in [connection with] oil and gas wells" from the general rule of § 263(a). Section 263(c) provides:

(c) Intangible drilling and development costs in the case of oil and gas wells.— Notwithstanding subsection (a), regulations shall be prescribed by the Secretary under this subtitle corresponding to the regulations which granted the option to deduct as expenses intangible drilling and development costs in the case of oil and gas wells and which were recognized and approved by the Congress in House Concurrent Resolution 50, Seventy-ninth Congress.

I.R.C. § 263(c).

The regulations to which § 263(c) refers, derive from the peculiar history of the IDC deduction. The "IDC option", as the deduction is known, was first promulgated in Treasury Department regulations in 1918, without reference to any specific Congressional enactment. See *Harper Oil Co. v. United States*, 425 F.2d 1335, 1338 (10th Cir. 1970). In 1945 the Fifth Circuit, recognizing the lack of statutory authority for the IDC option, cast doubt on its validity in *F.H.E. Oil Co. v. Commissioner*, 147 F.2d 1002 (5th Cir. 1945). Congress promptly responded by adopting the Concurrent Resolution to which § 263(c) now refers. The Resolution states in relevant part:

*Resolved by the House of Representatives (the Senate concurring),* That in the public interest the Congress hereby declares that ... the Congress has recognized and approved the provisions of section 29.23(m)–16 of Treasury Regulations 111 and the corresponding provisions of prior Treasury Regulations *granting the option to deduct as expenses such intangible drilling and development costs.*

Passed July 21, 1945.

Concurrent Resolution 50, 79th Cong., 1st Sess., 59 Stat. 844 (1945) (emphasis added).

In 1954, when it enacted a new Internal Revenue Code, Congress adopted Section 263(c). Commenting on the regulatory, judicial, and legislative history of the IDC option, Judge (now Justice) Blackmun declared in *Harper Oil Co.*, 425 F.2d at 1335 that "[t]he option, although long possessed of dubious statutory ancestry, now has firm congressional authority in § 263(c) of the 1954 Code."

A regulation implementing Section 263(c) of the Code was promulgated by the Treasury Department in 1965 as Treas.Reg. § 1.612–4(a). That regulation is almost identical to the regulations which were cited in the July 21, 1945 Concurrent Resolution. *See Exxon Corp. v. United States, supra,* 547 F.2d 548 at 554 n.9. This regulation provides in relevant part:

Charges to capital and to expense in case of oil and gas wells.—(a) *Option with respect to intangible drilling and development costs.* In accordance with the provisions of section 263(c), *intangible drilling and development costs incurred by an operator . . . in the development of oil and gas properties* may at his option be chargeable to capital or to expense. This option applies to all expenditures made by an operator for wages, fuel, repairs, hauling, supplies, etc., *incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas.* Such expenditures have for convenience been termed intangible drilling and development costs. They include the cost to operators of any drilling or development work . . . done for them by contractors under any form of contract, including turnkey contracts. Examples of items to which this option applies are, all amounts paid for labor, fuel, repairs, hauling, and supplies, or any of them, which are used—

(1) In the *drilling, shooting, and cleaning of wells,* . . . .

Treas.Reg. § 1.612–4(a) (emphasis added).

The Commissioner's arguments focus on the portions of regulatory language which refer to the deductibility of costs "incurred . . . in the development of oil and gas properties," including costs incident to the "drilling of wells and the preparation of wells for the production of oil or gas." From this language, the Commissioner concludes that the regulation makes the IDC option available only to *developmental activities,* as distinct from exploratory activities. The dividing line between development and exploration, according to the Commissioner, is that point at which an operator decides to produce the hydrocarbons that drilling has discovered or that drilling might encounter.

Drawing on the exploration/development distinction, the Commissioner urges a two-pronged test for determining whether the costs of drilling offshore wildcat wells qualify for the IDC option. Under that test, the costs of drilling will qualify for the IDC option when:

(1) the cost of the drilling was incurred *after* a taxpayer has discovered an oil or gas reservoir and *decided* to commence production; or

(2) when the taxpayer was drilling "wells," which the Commissioner defines restrictively as a shaft *drilled with the intention* of producing from that shaft any hydrocarbons encountered in commercial quantities. See Brief for Appellant at 32–33.

Since Sun Co. drilled the wells in question prior to any decision with respect to production from the wells and since it has not demonstrated that it had an intent to produce hydrocarbons from the shafts that it drilled, the Commissioner argues that we should reverse the Tax Court's decision which permitted Sun to deduct its drilling costs.

III.

On four separate occasions, if the instant action is included, the Tax Court has rejected the Commissioner's exploratory/developmental distinction and two-pronged test. *See Monsanto Company,* No. 1417–79 (U.S.

T.C., filed Jan. 6, 1982); *Sun Co.*, 74 T.C. 1481 (1980) (the instant action); *Gates Rubber Co.*, 74 T.C. 1456 (1980); *Standard Oil Co. (Indiana)*, 68 T.C. 325 (1977). The question, however, is one of first impression in this Court as well as in the other Courts of Appeal.[3] We find ourselves in agreement with the decisions of the Tax Court and write only to emphasize that the Commissioner's interpretation of Treas.Reg. § 1.612–4(a) is contrary to the language of the regulation. Moreover, it disregards the legislative history and Congressional intent underlying § 263(c) of the Internal Revenue Code.

### A.

The regulation itself does not draw any distinction between exploratory and developmental drilling. The regulation states quite clearly that: "[T]his option applies ... (1) in the drilling, shooting, and cleaning of wells." The Commissioner cites to no legislative history that would contradict this unambiguous directive.

As authority for the exploratory/developmental distinction the Commissioner points to the Tax Court's decision in *Louisiana Land & Exploration Co. v. Comm'n*, 7 T.C. 507 (1946) *aff'd* 161 F.2d 842 (5th Cir. 1947). In that case the Tax Court held that the cost of a geophysical survey constituted a capital expenditure and was not deductible under the IDC option. Using that holding as a springboard, the Commissioner concludes that the IDC option is available for later developmental activities, but not for exploratory operations. Brief for Commissioner at 17. There is no indication, however, in *Louisiana Land & Exploration Co.* that the Tax Court adopted a developmen-

tal/exploratory distinction for which the Commissioner now contends. Indeed, that court identified geophysical surveying as an initial stage in property development, and distinguished that activity from both *exploratory and developmental drilling*. The Tax Court explained:

It thus appears that the results of this survey were to guide petitioner in determining generally whether and to what extent these large areas of land *should be explored by drilling wells.... This survey was not connected with the drilling of any particular well or wells and was not confined to any restricted area which had been tentatively singled out as the location of a well.* Under these circumstances it seems abundantly clear that the survey *was the first step in the overall development* for oil of these tracts of land and that the benefit derived from the expenditure was to be enjoyed by petitioner in its business during the entire useful life of the *asset being developed.*

7 T.C. 516–17 (emphasis added).

Thus, far from supporting the Commissioner's argument, *Louisiana Land*, in our opinion, supports the taxpayer's interpretation of the regulations.

The Commissioner's restrictive definition of a well, as a shaft drilled with the *intention* of producing from that shaft hydrocarbons encountered in commercial quantities, is similarly lacking in support. There is nothing in Treas.Reg. § 1.612–4(a) requiring the taxpayer to intend to produce oil or gas from a particular well: the regulation contemplates that the IDC option is available equally to all wells whether drilled for production or drilled merely in the search of oil and gas.[4]

---

**3.** *Gates Rubber Co.*, 74 T.C. 1456 (1980) is currently on appeal before the Tenth Circuit *sub nom. Gates Rubber Co. v. Comm'r*, No. 81–1523. That court's opinion has yet to be filed.

**4.** In flatly rejecting the Commissioner's "intent to produce" test the Tax Court has provided a definition of an oil and gas well that is consistent with the regulatory language and history.
    For purposes of section 263(c) and section 1.612–4, Income Tax Regs., a "well" is a

shaft drilled in search of hydrocarbons which shaft is designed and drilled in such a manner that it would be capable, upon encountering hydrocarbons and upon appropriate completion of the shaft by the operator, of conducting or aiding in the conduction of hydrocarbons to the surface ... If an appropriately designed shaft is drilled in search of hydrocarbons, it is a "well" regardless of the presence or absence of an intent to produce hydrocarbons from that particular shaft. ...

The Commissioner cites the district court decision in *Miller v. United States*, 78–1 U.S.T.C. ¶ 9127 (C.D.Cal.1977), as recent judicial authority supporting a limitation of the IDC option to wells drilled with an intent to produce hydrocarbons therefrom. But, *Miller* provides little comfort for the Commissioner. First, the district court in *Miller* specifically found that the taxpayer's expenditures were for the purpose of discovering hot water energy sources, and did not relate to oil or gas as is required by both the regulation and Section 263(c). Second, the Court in *Miller* concluded the drilling was solely for the purpose of "obtaining and accumulating" data. 78–1 U.S.T.C. at 83097. Third, the district court expressly held that the "wells" in question were "slim holes" not physically capable of production, (Findings 16 and 25, 78–1 U.S.T.C. at 83096), in contrast to the Tax Court's findings concerning the wells at issue here. (A. 208). Finally, and most important in our opinion, is the reliance which *Miller* placed on *Louisiana Land* (discussed above) in its (*Miller's*) holding that the geological expenses were not deductible because they were incurred in connection with overall property development.

We are, therefore, satisfied that any reliance which the Commissioner may place on Treasury Regulations to support his argument and purported distinction between exploratory and developmental drilling, is misplaced.[5]

### B.

We turn then to an examination of the statute itself, Section 263(c). Here, we find even more persuasive reason for rejecting the Commissioner's exploratory/developmental distinction and two-pronged test.

The Congressional intent underlying Section 263(c) is revealed by the sequence of events leading up to its enactment. As we have earlier explained, when the validity of the IDC regulations was put into question by the Fifth Circuit's decision in *F.H.E. Oil Co. v. Commissioner*, 147 F.2d 1002 (5th Cir. 1945), Congress almost immediately thereafter adopted concurrent Resolution 50, to which we have earlier referred. That resolution, as we observed, recognized and approved the IDC regulations.[6] The House Report indicates the primary motivation for Congress's adoption of the resolution—"the uncertainty occasioned by raising doubts as to the validity of these regulations is materially interfering in the *exploration for* and production of oil." H.Rep.No. 761, 79th Cong. 1st Sess., p. 2 (1945) (emphasis added). We read this declaration as an announcement by Congress that it deemed the IDC option essential to encourage investors to risk capital in the search and recovery of oil and gas.

When the Eighty-Third Congress provided statutory authority for the IDC option in 1954 by enacting Section 263(c), it did not depart from the objectives announced by the Congress which had adopted Concurrent Resolution 50. Indeed, the Senate Report accompanying the 1954 Code, as it pertains to Section 263(c) states, "[t]he bill [does] not affect the treatment now allowed by regulations relating to the deduction or capitalization of intangible drilling and development costs in the case of oil and gas." S.Rep.No. 1622, 83d Cong., 2d Sess., p. 81 (1954), U.S.Code Cong. & Admin.News 1954, pp. 4629, 4714. Thus, the legislative history

---

This definition of wells avoids the concomitant administrative nightmare which would result upon the adoption of respondent's subjective "intent to produce" test. Under this definition, whether a shaft is a "well" is determined on the basis of objective factual criteria.
*Gates Rubber Co.*, 74 T.C. 1456. (1980 Transfer Binder), Tax Ct.Rep. ¶ 37,292 at 4157 (CCH).

**5.** We observe that in the only published ruling which bears on deductions for the costs of

drilling wells, the Commissioner apparently has adopted a position incompatible with the one he asserts here. In Rev.Rul. 69–583, 1969—2 C.B. 41, the Commissioner ruled that the intangible costs of drilling water injection wells in connection with the development of oil and gas property qualified for the IDC option, even though such wells cannot be used for production.

**6.** See p. 296 *supra*, for the text of the Resolution.

which lead up to the enactment of Section 263(c) indicates that the IDC option was codified as a result of a continuing Congressional objective to encourage risk-taking with respect to the exploration for, and production of, oil and gas.

A reading of subsequent legislative proposals affecting the IDC option buttresses the conclusion that Congress, in enacting Section 263(c), intended to reward investors who risk capital in the search for, and recovery of, oil and gas. In 1977 when an amendment to the Tax Reduction and Simplification Act of 1977 was introduced on the Senate floor, the following observations were made concerning the amendment's liberalizing effect on the IDC option:

> Drilling is an extremely high risk business. Only one *exploratory well* in nine produces anything. Eight out of nine *exploratory wells* are dry holes. In addition, at least 20 percent of *developmental wells* are dry holes. * * * In order to prevent increasing dependence on overseas oil, our tax laws must not discourage risk taking in the oil and gas business.
>
> The 15-percent penalty tax on intangible drilling costs discourages active *wildcatting which is so important to our energy needs.*
>
>     *     *     *     *     *     *
>
> Any delay in enacting this amendment will result in reductions in *desperately needed exploratory drilling.*

123 Cong.Rec. S6701–6702 (daily ed. Apr. 28, 1977) (Sen. Bentsen) (emphasis added).

Moreover, other judicial pronouncements and commentators have consistently expressed the conclusion that the IDC option was established as an incentive to oil and gas exploration. *See, e.g., Exxon Corp. v. United States,* 547 F.2d 548, 555 (Ct.Cl. 1976); *United States v. Cocke,* 399 F.2d 433 (5th Cir. 1968); Jackson, *Tax Planning Before Drilling: The Operator's Problem,* 27 Tul.L.Rev. 21 (1952) and Murray, *Intangible Drilling and Development Costs of Oil and Gas Wells,* 26 Taxes 312, 316 (1948). This incentive has assumed even greater relevance in light of current energy problems.

Thus, we are not persuaded that the Commissioner's statutory interpretation is one that we should embrace. Indeed, as we understand the Commissioner's interpretation, the IDC deduction would be available for drilling taking place *after* the discovery of commercially recoverable deposits of hydrocarbons, when investment risks are obviously at a minimum. Under such an interpretation, the option would be generally unavailable to reduce the costs of drilling exploratory wells, at a stage when financial risks were the greatest. Obviously, such a construction would have the effect of turning the Congressional objective of rewarding risk-taking on its head. Indeed, the legislative history of Section 263(c), which we have recounted, can only lead to a conclusion, which is contrary to the Commissioner's interpretation, "that it is the drilling of the exploratory type well, as opposed to development[al] wells, which Congress has the greater interest in encouraging by means of the IDC option." *Standard Oil Co.,* 68 T.C. at 347. We therefore have no hesitancy in rejecting the Commissioner's interpretation of Section 263(c), which we conclude is contrary to the intent expressed by Congress when that Statute was enacted.

## IV.

We conclude that neither the Regulation nor the Statute can be read as the Commissioner urges us to read them. In our opinion, the Commissioner has erroneously interpreted both Section 263(c) and Treas. Reg. § 1.612–4.

We will therefore, affirm the decision of the Tax Court which permitted the taxpayers to deduct the intangible costs of drilling the seventeen offshore wells which are at issue on this appeal.