LEONARD T. RUTH and MARGARET J. RUTH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ruth v. Commissioner
Docket No. 7646-78.
United States Tax Court
T.C. Memo 1983-586; 1983 Tax Ct. Memo LEXIS 205; 46 T.C.M. (CCH) 1484; T.C.M. (RIA) 83586; 78 Oil & Gas Rep. 649; September 22, 1983. *205 In 1974, P purchased an interest in a cash method oil and gas limited partnership. In that year, the limited partnership entered into turnkey contracts with the parent corporation of the general partner for the drilling of oil and gas wells. Pursuant to such contracts, the partnership paid the turnkey charges to the parent in 1974. Held, Ps are entitled to the deduction for the intangible drilling costs in 1974 since the payments clearly reflected the income of the partnership in that year. Keller v. Commissioner,79 T.C. 7 (1982), on appeal (8th Cir., Dec. 6, 1982), followed. Paul D. Ritter, Jr.,Wayne F. Collier, and Thomas E. Bulleit, Jr., for the petitioners. Jack A. Joynt, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined a deficiency of $92,495.10 in the petitioner's Federal income tax for 1974. After a concession by the petitioners, the sole issue for decision is whether the petitioners, as limited partners in an oil and gas drilling partnership, are entitled to deduct intangible drilling and development costs in 1974, the year in which the partnership entered into turnkey contracts for the drilling of oil and gas wells. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Leonard T. and Margaret J. Ruth, husband and wife, maintained their legal residence in Lexington, Ky., at the time they filed their *207 petition in this case. They filed a joint Federal income tax return for 1974 with the Internal Revenue Service, Memphis, Tenn.
During the year in issue, Patrick Petroleum Corporation of Michigan (Patrick of Michigan) was a Michigan corporation and the principal operating subsidiary of Patrick Petroleum Company, a Delaware corporation (Patrick of Delaware). Patrick of Michigan conducted business operations for Patrick of Delaware. During 1974, the Patrick organization had nine division offices, staffed by geologists, land men, and engineers. For the fiscal year ended April 30, 1975, the Patrick companies produced approximately 600,000 barrels of oil and 3 billion cubic feet of gas. In that year, the Patrick companies participated in approximately 1,000 producting oil and gas wells and in the drilling of 197 wells. As a part of its oil and gas operations, Patrick of Delaware organized limited partnerships to engage in the business of exploring for oil and gas, acquiring oil and gas leases and other interests, drilling oil and gas wells, and conducting other operations relating to the exploration, production, and sale of oil and gas. In early November 1974, the management *208 of Patrick decided to organize a limited partnership known as Southwest Lucky Limited Partnership (Lucky), with Patrick of Michigan as the general partner of such limited partnership. Patrick of Michigan maintained an inventory of oil and gas prospects. From such inventory, the manager of exploration selected nine specific prospects for ownership by Lucky. The selection was designed to obtain a reasonable mixture of economic risk and provide an economic return to the prospective limited partners. The selection also took into consideration the need for funds to drill the wells. After the selection of the nine oil and gas prospects, the manager of exploration prepared a geologic report, a geologic map, a reserve estimate, and an economic forecast for each of the prospects. Such information was included in a brochure and offered to prospective investors on December 7, 1974. Prospective investors also received a subscription and limited partnership agreement. A purchaser was to include in the subscription agreement the amount of the interest which he wished to purchase, and he was required to submit his entire payment with the executed subscription agreement. The partnership *209 agreement required Lucky to drill the nine wells which were located in Texas, Louisiana, and Tennessee. The partnership agreement further provided that all deductions and credits with respect to items which were noncapital expenditures were allocable to the limited partners and that all payments and credits to capital expenditure items were allocable to the general partner, except for the deduction for depletion which was allocated to the partners in the same manner as revenue. On December 16, 1974, Mr. Ruth executed a subscription agreement to purchase an interest in Lucky and delivered $200,000 to Patrick of Michigan to pay for such interest. By letter dated December 23, 1974, Patrick of Michigan acknowledged receipt of Mr. Ruth's check and enclosed a copy of the executed limited partnership agreement. On December 21, 1974, Patrick of Michigan, in its capacity as general partner of Lucky, entered into nine separate turnkey contracts with Patrick of Delaware to drill the nine wells for Lucky. Each contract identified the oil and gas prospect to be drilled, stated the price for the performance of the turnkey contract, and required the full price of the contract to be paid to *210 Patrick of Delaware, as the turnkey drilling contractor, in 1974. On December 31, 1974, Lucky paid $1,300,000 to Patrick of Delaware as the aggregate price for the performance of such contracts. The aggregate price was based on Patrick of Delaware estimating intangible drilling costs of $833,500, overhead of $166,700, and the costs of $300,000 for assuming the turnkey risks. In the first 10 days of 1975, Patrick of Delaware expended $2,856,611 in its business operations, and the receipt of the $1,300,000 was significant in its financial planning. Patrick of Delaware reported the $1,300,000 received from Lucky as ordinary income for its taxable year ending August 31, 1975.
The actual drilling of the nine wells was subcontracted by Patrick of Delaware to independent contractors who were paid by Patrick of Delaware in accordance with their individual contracts. The drilling of all the wells commenced in 1975, and all wells were completed that year. Patrick of Delaware paid a total of $934,374.17 to the independent drillers for their work on the nine wells. Lucky was a cash method taxpayer and reported its income and expenses on a calendar year basis. On its return for 1974, *211 Lucky made a valid election to expense intangible drilling costs and claimed a deduction for such costs in the amount of $1,300,000. Such deduction was allocated entirely to the limited partners as provided in the partnership agreement. Of such amount, $200,000 was allocated to Mr. Ruth, and the petitioners claimed a $200,000 deduction on their return for 1974 as their distributive share of the partnership loss. In his notice of deficiency, the Commissioner determined that the $1,300,000 claimed by Lucky as intangible drilling costs was not properly deductible in 1974. However, he has taken the position that Lucky is entitled to deductions for intangible drilling costs of $779,658.62 in 1975 and $520,341.38 in 1976 and that such amounts are properly allocable to each limited partner according to his or her interest in the limited partnership. OPINION The sole issue for decision is whether the petitioners are entitled to a deduction in 1974 for their share of intangible drilling and development costs which Lucky claimed for that year as a result of the turnkey agreements entered into with Patrick of Delaware. Although no specific statutory authority existed for the election *212 to deduct intangible drilling and development costs prior to 1954, the option to deduct such costs has been available to oil and gas operators since 1917. See Standard Oil Co. (Ind.) v. Commissioner,68 T.C. 325, 345 n. 9 (1977), affd. sub nom. Sun Co. Inc. & Subs. (Consol.) v. Commissioner,677 F. 2d 294 (3d Cir. 1982); F. Burke and R. Bowhay, Income Taxation of Natural Resources par. 14.02 (1983). Congressional approval of this deduction was set forth in section 263(c) of the Internal Revenue Code of 1954, [1] which directs the Commissioner to prescribe regulations corresponding to previous regulations which had granted the option to deduct intangible drilling and developments costs as expenses. Section 1.612-4, Income Tax Regs., implements section 263(c) and provides, in part, that intangible drilling and development costs: incurred by an operator (one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or any other form of contract granting *213 working or operating rights) in the development of oil and gas properties may at his option be chargeable to capital or to expense. * * * [Intangible drilling costs] include the cost to operators of any drilling or development work * * * done for them by contractors under any form of contract, including turnkey contracts. * * * [Emphasis added.] While the parties agree that Lucky made a valid election to expense all intangible drilling and development costs, they disagree on the year in which the deductions for such costs are allowable. The petitioners argue that in 1974, Lucky made the payments required under the turnkey contracts and that it had no right to receive a refund of any of such payments. They maintain that there was a business purpose for making the payments in 1974 and that Lucky received its bargained-for benefit in 1974 by shifting the risks to Patrick of Delaware. Consequently, they conclude that claiming the deduction in 1974 did not distort the income of Lucky. The Commissioner does not challenge the business arrangement or the amounts *214 of the deductions claimed by Lucky, but he does dispute the timing of the deductions. He asserts that there was no business purpose for the payments in 1974 and that the turnkey arrangements were merely "contracts of convenience" designed to create a tax deduction in 1974. He also contends that the turnkey contracts constituted assets having a life beyond the taxable year and that to allow a deduction for their entire costs in 1974 distorts income. The facts and arguments in this case are strikingly similar to those presented in Keller v. Commissioner,79 T.C. 7 (1982), on appeal (8th Cir., Dec. 6, 1982). In Keller, the taxpayer was a limited partner in a partnership which, in turn, became a limited partner in a drilling partnership. In December 1973, the drilling partnership transferred funds to various drilling contractors and service companies, pursuant to more than 330 footage and daywork drilling contracts, third-party well-servicing contracts, and turnkey contracts. In addition, the partnership paid additional amounts to supervise the drilling of the wells (well charges). On its returns for 1973, the partnership deducted all such payments. The Commissioner *215 disallowed such deductions and argued that (1) the payments were in the nature of nondeductible, refundable deposits; (2) the payments were not actually made with a business purpose; and (3) the deduction of such payments in 1973 would result in a substantial and material distortion of income. 79 T.C. at 26. After an exhaustive analysis of the applicable statutes and cases in Keller, we set forth the test for the deductibility of intangible drilling costs by cash methods taxpayers. We looked to whether the transfers of funds were truly payments rather than refundable deposits and whether the payments resulted in a material distortion of income. In determining whether the payments resulted in a material distortion of income, we stated that "the material distortion analysis mandated by section 446(b) must include a substantial consideration of the business purpose aspects of the transaction" and that "'a substantial legitimate business purpose satisfies the distortion of income test.'" 79 T.C. at 28. We applied these tests to the payments and held that some *216 of the amounts paid in 1973 pursuant to both the footage and daywork contracts and the third-party well-servicing contracts were in the nature of "deposits" since the partnership had the unilateral right to receive a refund of the payments. We also applied the tests to the well charges and found that no business purpose existed for the payment of such charges, because the operator was already obligated to provide the partnership with the same services at the same price regardless of the payment. 79 T.C. at 44-45. We found no motive for prepayment other than the acceleration of tax deductions and disallowed the deduction because it materially distorted the income of the partnership. 79 T.C. at 45. In Keller, we reached a different result with respect to the turnkey contracts. [2] First, we found that the partnership had no unilateral power to recover the amounts paid pursuant to the turnkey contracts and concluded that the amounts were truly payments rather than mere deposits. 79 T.C. at 45-47. Thereafter, we looked to whether the payments clearly reflected income. We found that the payments clearly reflected income and allowed the *217 full amount of such payments to be deductible in 1973. We explained: We base this conclusion on the unique characteristics of the turnkey contract. An owner pays a significant premium to a driller to get a turnkey obligation, as contrasted with a footage and daywork contract. The turnkey contract obligates the driller to drill to the contract depth for a stated price, regardless of the time, materials, or expenses required to drill the well. The turnkey contract thus locks in prices. It also shifts the drilling risks from the owner to the driller. By signing and paying the turnkey obligation, the drilling partnership knew that, as far as it was concerned, the well was drilled. Therefore, we find that the partnership effectively got its bargained for benefit in the year of payment. Accordingly, cash basis taxpayers, like the drilling partnership, properly may deduct turnkey payments in the year of payment. [79 T.C. at 47.] *218 We find Keller to be dispositive of the issue presented in this case. The contracts entered into by Lucky and Patrick of Delaware were turnkey contracts. As in Keller, Lucky paid a premium to Patrick of Delaware to secure the turnkey obligations, and in so contracting, Lucky effectively locked in the prices of drilling the nine wells and shifted the risks of drilling to Patrick of Delaware. By signing and paying the turnkey obligation, Lucky got its bargained-for benefit in 1974. Therefore, in accordance with our holding in Keller, we find that the deduction of the payments in 1974 clearly reflected income and hold that Lucky is entitled to deduct the full amount of such payments in 1974. See Keller v. Commissioner,79 T.C. at 47. To reflect the concession by the petitioners, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the year in issue.↩
2. A turnkey contract is a contract in which an independent drilling contractor undertakes to do all the work required to complete a well in a workmanlike manner, place it on production, and turn it over ready to "turn the key" and start the oil running into the tanks for an amount stipulated in the contract. See Continental Oil Co. v. Jones,177 F.2d 508↩ (10th Cir. 1949); H. Williams and C. Meyers, Oil and Gas Terms 788 (5th ed. 1981).